Robert H. Trust
Amy Edgy
Joanna C. McDonald
**LINKLATERS LLP**
1345 Avenue of the Americas
New York, NY 10105
Telephone: (212) 903-9000
Facsimile: (212) 903-9100

*Counsel to the Foreign Representative*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 |
| Lecta Paper UK Limited,[1] | Case No. 19-13990 (MEW) |
| Debtor in a Foreign Proceeding. | |

## DECLARATION OF ANDREA MINGUZZI
## IN SUPPORT OF VERIFIED PETITION UNDER CHAPTER 15 FOR
## RECOGNITION OF A FOREIGN MAIN PROCEEDING AND RELATED RELIEF

I, Andrea Minguzzi, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of

perjury under the laws of the United States of America, as follows:

1.    I am the Executive Chairman of the Group and a director of Lecta Paper UK

Limited (the "Debtor"), which is a wholly-owned indirect subsidiary of Lecta S.A. (the

"Parent," together with the Debtor and its subsidiaries, the "Group").  I am acquainted with the

affairs of the Group and I am fully apprised of its financial position.

2.    In my capacity as Executive Chairman, I have been extensively involved in the

negotiations with the Group's key creditors that have culminated in, among other things, the

---

[1]    The last four digits of the Debtor's England and Wales company registration number are 2963.  The location of
the Debtor's registered office is Unit 4 Shenley Pavilions, Chalkdell Drive, Shenley Wood, Milton Keynes,
Buckinghamshire, MK5 6LB, United Kingdom.

scheme of arrangement (the "Scheme") that is currently the subject of proceedings (the "English Proceeding") before the Business and Property Courts of the High Court of Justice of England and Wales (the "High Court"). I have detailed knowledge of, and experience with, the Debtor's affairs and its creditors.

3.     On December 16, 2019, the Debtor filed an application under part 26 of the Companies Act 2006 of the United Kingdom (the "Companies Act") commencing the English Proceeding and requesting that the High Court approve the Debtor's request to convene a meeting (the "Scheme Meeting") of the Debtor's creditors (the "Scheme Creditors")[2] for the purpose of obtaining the requisite votes in favor of the Scheme. On December 19, 2019, the High Court held a hearing to consider authorizing the Debtor to convene the Scheme Meeting. Following the Convening Hearing, on December 19, 2019, the High Court entered an order (the "Convening Order") authorizing the Debtor to convene the Scheme Meeting on January 23, 2019. The Convening Order approved my appointment as the "foreign representative" as defined in section 101(24) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and authorized me to seek chapter 15 recognition of the English Proceeding. Accordingly, the Debtor commenced this chapter 15 case (the "Chapter 15 Case") on the date hereof by filing a petition seeking recognition of the English Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

4.     I submit this declaration in support of the *Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* (the "Verified Petition" and together with the Form of Voluntary Petition [Dkt. No. 1], the "Petition")[3] to provide an

---

[2]   The Scheme Creditors are the Existing SSN Holders (as defined below).

[3]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition.

overview of the Debtor and the Scheme.  I have reviewed the Petition, and it is my belief that the relief sought therein is necessary to implement the restructuring described herein.

5.    Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Group and advisors to the Debtor, or my opinion based upon experience, knowledge, and information concerning the Debtor.  I am authorized to submit this declaration on behalf of the Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

6.    Section I of this declaration describes the Debtor and the Group, including specific information about the Debtor's connections to England and the United States and the Group's capital structure.  Section II describes the events leading up to the Scheme, including a description of the Group's corporate restructuring of which the Scheme is a critical component.  Section III provides an overview of the Scheme, including a description of the key elements of the Scheme.  Finally, section IV describes the need for chapter 15 relief.

## I.    Introduction to the Debtor and the Group

### A.    The Group

7.    The Group is a leading producer and supplier of specialty and coated wood-free paper with production facilities in Spain, Italy and France, and sales or distribution centers in New York, Morocco and throughout Europe.  As of the beginning of 2019, the Group employed approximately 3,200 full-time employees, fifteen of which are located in the United Kingdom. The Group sells its products to clients worldwide and, through its subsidiaries, has been in the business of paper production and distribution for 300 years.

3

8.      The primary generators of the Group's revenue are sales of produced paper and the distribution of third-party paper products.  Key end markets for the Group's specialty paper are the growing labelling and packaging industries.  The Group is vertically integrated and produces its own pulp and base paper for specialty paper production.  Additionally, the Group's operations generate electricity and steam from its co-generation turbines located near its paper mills.  The generated electricity is either consumed internally or fed into the local consumer energy grid at a feed-in price.

9.      In 1999, the Parent was incorporated as public limited company under the laws of Luxembourg for the purposes of acting as a holding company following the acquisition of the Torraspapel group of companies.  As of December 19, 2019, the Parent's largest shareholder is Capital Ventures Nominees Ltd, a private limited company incorporated in England and Wales (together with the Parent's other shareholders, the "Parent Shareholders") which owns approximately 50.66% of the Parent's issued and outstanding share capital.[4]  The Parent's indirect subsidiary Torraspapel S.A. ("Torraspapel") is located in Spain and functions as the operating headquarters of the Group.[5]  Torraspapel is a wholly-owned direct subsidiary of Sub Lecta S.A. ("Sub Lecta"), a Luxembourg company. [6]

10.      Located in Milton Keynes, England, the Debtor is a private limited company incorporated in England and Wales and is a wholly-owned direct subsidiary of Torraspapel.

---

[4]   The Parent's remaining issued and outstanding share capital is held by Adavale Global Holdings Limited (owned by Smurfit Kappa Group plc.) (10.56%), CCIEL LLC (10.44%), Intermediate Capital Investors (2) (8.06%), Management (7.81%), Midocean Ocean Associates SPC. (5.84%), Barkly Investments Ltd (1.89%), MidOcean Investor LP (1.49%) and HSBC Bank Plc (1.07%).  The other approximately 30 shareholders each hold 1% or less of the Parent's issued and outstanding share capital.

[5]   The Group's strategic and key operating decisions, including those of the Debtor, are managed centrally from the Group's headquarters in Spain.

[6]   Torraspapel is the direct parent of Lecta North America Inc. (f/k/a Torraspapel USA Inc.), which is located in Purchase, New York, and is a commercial agent for North America.

The Debtor is a sales agent and distributor covering the United Kingdom and Ireland on behalf of the Group.  The Debtor is also co-issuer with the Parent under the indentures governing the Existing SSNs (as defined below), the primary debt obligations to be compromised under the Scheme.

11.     The Debtor's registered office is located in England, as are members of the Debtor's management team, including its Commercial Manager and Finance Manager and its customer service team.  Human resources, payroll, accounting, collection and tax functions are managed from England.  In addition, the Debtor is a resident of the United Kingdom for tax purposes and the majority of the Debtor's material assets, which consist of inventory and trade receivables, are located there.  As further explained below, the indentures governing the Existing SSNs contain English governing law and forum selection clauses and state that the Debtor is incorporated in England.  The Debtor's public advertising campaigns typically disclose that the Debtor is an English company and refer to its registered office located in England.

12.     The Debtor has connections to the United States.  The Debtor has an evergreen retainer with the New York office of Linklaters LLP, which is being held in a client trust account located in New York.  As further explained below, the supplemental indentures that amended the indentures governing the Existing SSNs are governed by New York law and disputes thereunder are subject to the non-exclusive jurisdiction of the New York courts.

**B.     The Group's Capital Structure**

13.     As of October 31, 2019, the aggregate principal amount outstanding under the Group's debt instruments (excluding the Other Indebtedness, as defined below) is approximately €714 million, consisting of the following:

5

|  | Total principal outstanding (as of October 31, 2019) | Total accrued interest (as of October 31, 2019) |
|---|---|---|
| Existing SSNs | €600,000,000 | €9,759,375 |
| RCF | €65,000,000 | €628,333 |
| Operating Subsidiaries' Debt | €38,511,198 | €296,897 |

14.     The Debtor and the Parent are co-issuers under: (i) €225 million floating rate senior secured notes due 2022 (the "Floating Rate SSNs") originally issued by the Parent pursuant to an indenture dated July 27, 2016 (the "Floating Indenture") among the Parent, Deutsche Trustee Company Limited as trustee (the "Existing SSN Trustee"), Deutsche Bank AG, London Branch as security trustee (the "Existing Security Trustee") and certain other parties and (ii) €375 million 6.5% fixed rate senior secured notes due 2023 (the "Fixed Rate SSNs" and together with the Floating Rate SSNs, the "Existing SSNs" and the holders of the Existing SSNs, the "Existing SSN Holders") originally issued by the Parent pursuant to an indenture dated July 27, 2016 (the "Fixed Indenture," together with the Floating Indenture, the "Indentures") among the Parent, the Existing SSN Trustee, the Existing Security Trustee and certain other parties.[7] Torraspapel, its French subsidiary Condat S.A.S. ("Condat") and several other members of the Group are guarantors under the Indentures.  The Group's obligations under the Indentures are secured by certain assets (the "Collateral") of the Parent, Sub Lecta, Torraspapel, Condat and certain other members of the Group.

15.     Torraspapel is the borrower under an English law governed €65 million multicurrency revolving facilities agreement dated July 27, 2016 (the "RCF Agreement," the

---

[7]   Deutsche Bank AG, London Branch has since replaced  Deutsche Trustee Company Limited as Existing SSN Trustee under the Indentures.

facilities under the RCF Agreement, the "RCF," and the lenders under the RCF, the "RCF Lenders"). The Group's obligations under the RCF and the Existing SSNs are secured by the Collateral. The RCF is governed by English law (other than its covenants and event of default provisions, which are governed by New York law) and disputes thereunder are subject to the exclusive jurisdiction of the courts of England (other than with respect to disputes arising solely out of the RCF's covenants or events of default provisions, which are subject to the exclusive jurisdiction of the New York courts). As of December 19, 2019, the RCF is fully drawn.

16.    Torraspapel, Condat and other members of the Group have incurred debt under various facilities (the "Operating Subsidiaries' Debt") with approximately €38.5 million in outstanding principal amount as of October 31, 2019. In addition, Torraspapel and certain of its French, Spanish and Italian subsidiaries have entered into certain financing arrangements in connection with co-generation facilities as well as factoring and other trade finance arrangements (collectively, and together with the Operating Subsidiaries' Debt, the "Other Indebtedness"). The Group's obligations under the facilities in respect of the Other Indebtedness are not being compromised in the Group's restructuring.

17.    The rights of the Existing SSN Holders and the RCF Lenders and the ranking of debts and liabilities owed to them are governed by an English law intercreditor agreement dated July 27, 2016 (the "Intercreditor Agreement"). The Debtor will accede to the Intercreditor Agreement as obligor pursuant to the restructuring. Under the Intercreditor Agreement, the Existing SSNs rank *pari passu* with the RCF with respect to payment but are subordinated to the RCF with respect to the proceeds of enforcement. Pursuant to the Intercreditor Agreement and following the occurrence of the Sub Lecta Sale (as defined below), the security and guarantees in respect of the Existing SSNs and the RCF will be released.

7

18.    Due to the Group's liquidity issues, the Group was unable to pay the interest on the Floating Rate SSNs due on November 4, 2019.  Under the Lock-up Agreement, the parties thereto agreed to temporarily forbear from exercising rights or remedies in connection with this unpaid interest until the earliest of (i) the termination of the Lock-up Agreement, (ii) February 28, 2020,[8] which is the long-stop date under the Lock-up Agreement (the "Long-stop Date") and (iii) the effective date of the Group's restructuring (the "Restructuring Effective Date").

## II.    Background to and Objectives of the Scheme

### A.    Circumstances Leading to the Restructuring

19.    As the largest coated wood-free paper manufacturer by volume in southern Europe, the Group sold this paper product to generate the majority of its revenue and EBITDA. However, over the last decade, the coated wood-free paper market experienced accelerated decline as a result of digitalization and a decline in demand for print media.  In addition, the Group operates in a cyclical industry in which product prices and raw material costs are volatile, and periods of low product prices or high raw material costs negatively affect the Group's profitability and cash flows.  For example, the list price of hardwood pulp, a necessary component of coated wood-free paper, increased 62% from November 2016 to May 2018 and decreased by 19% from May 2018 to June 2019.  Paper production in Europe has steadily declined over the last decade, and most major producers have closed production facilities and wound back operations in certain sectors.

20.    To help address these challenges, the Group has invested heavily in restructuring its operations to enable it to serve a changed but still healthy market.  The Group invested more

---

[8]    The Parent and the Existing SSN Holders that are party to the Lock-up Agreement and hold a majority of the Existing SSNs may agree to extend the Long-stop Date.

than €120 million between 2012 and 2018 in an effort to shift its business away from coated wood-free paper and grow its specialty paper production capacity.[9]  The Group also attempted an initial public offering in 2017 to raise new equity, deleverage the Group and reduce the finance costs associated with the Existing SSNs.  Over the last few years, the Group implemented cost reduction measures, productivity improvements and equipment upgrades, and made additional capital expenditures to fund environment and safety updates for its co-generation turbines  (which enable the Group to source energy and sell it to third parties).

21.    Despite these efforts, the Group's financial results were negatively impacted during the nine-month period ending September 30, 2019, with sales volumes, net sales of paper and EBITDA decreasing by 12%, 7% and 26% year-over-year respectively.  Additionally, the Group has experienced significant liquidity constraints due to unexpected issues implementing system updates at its Garda mill in Italy, which negatively impacted sales and earnings.  Furthermore, the Group has recently faced significant working capital outflows precipitated by tightened supplier terms due to reduced credit insurance coverage and negative market sentiment resulting from recent insolvencies in the paper production sector.

B.    The Group's Restructuring

22.    In light of these liquidity constraints, in early September 2019, the Group entered into discussions with certain of its financial stakeholders, including a committee representing certain of the Existing SSN Holders and RCF Lenders (the "Committee"), to restructure the Group's capital structure, strengthen its liquidity profile and allow the Group to continue its

---

[9]    As part of its transformation strategy, the Group also aims to convert its unprofitable operations in France from coated wood-free paper production to specialty paper production.  This will require additional investment of approximately €92 million.

transformation into a specialty paper company.[10]  As a result of those good faith, arm's-length negotiations, on November 1, 2019, the Parent announced that a majority of Existing SSN Holders and certain other stakeholders of the Group had agreed upon the terms of a global restructuring.

23.    The terms of that restructuring were memorialized in a lock-up agreement (the "Lock-up Agreement").  As of December 5, 2019, the Lock-up Agreement had been entered into or acceded to by creditors representing:

- 92.15% of the Existing SSNs, representing:
  - 90.68% of the Fixed Rate SSNs; and
  - 94.61% of the Floating Rate SSNs; and
- 69.23% of the oustanding principal amount under the RCF.

The Lock-up Agreement requires the creditors and other stakeholders that have signed or acceded to it to take all actions required to implement the Group's restructuring on the terms set out therein.

24.    To facilitate the Scheme, the Indentures were amended pursuant to supplemental indentures dated December 4, 2019 (the "Supplemental Indentures," the Indentures as amended by the Supplemental Indentures, the "Existing SSN Indentures").  Pursuant to the Supplemental Indentures and in accordance with the Lock-up Agreement: (i) the Debtor acceded to the Indentures as co-issuer; (ii) the governing law of the Indentures was amended from New York law to the laws of England and Wales and (iii) the jurisdiction of the Indentures was amended from the courts of New York to the courts of England and Wales, in each case, for the purpose

---

[10] As of December 5, 2019, the Committee represents approximately 48.72% of the aggregate outstanding principal amount of the Existing SSNs and approximately 25.77% of the aggregate outstanding principal amount of the RCF.

of facilitating the Scheme.[11]  The Company acceded to the Lock-up Agreement on December 5, 2019, following its accession as co-issuer to the Existing SSN Indentures.

25.    To implement the Scheme and the global restructuring, a new holding company structure will be established.  The new structure will include a newly incorporated ultimate holding company of the Group ("Topco," together with its subsidiaries, the "Restructured Group"), which will issue new shares (the "New Equity") which will be distributed as further detailed below.  Topco will wholly own Paper Industries Financing S.à r.l. ("Holdco 3"), a newly formed Luxembourg company.  Holdco 3 will issue new junior unsecured notes due 2028 in the amount of €100 million (the "Junior Notes"), bearing interest at EURIBOR plus 0.25% and capitalized payment-in-kind interest of 7%.  No guarantees will be issued in favor of the Junior Notes.  Holdco 3 will wholly own Paper Industries Intermediate Financing S.à r.l. ("Holdco 2"), a newly formed Luxembourg company, which will issue new senior secured notes in the amount of €200 million due 2025 (the "New SSNs") and bearing interest at EURIBOR plus 6%.[12]  The New SSNs will be structurally and contractually subordinated to the Super Senior Facilities (as defined below) and the Junior Notes will be structurally and contractually subordinated to the New SSNs.

26.    The Existing SSN Holders will exchange the Existing SSNs for their pro rata

---

[11]  The Existing SSN Indentures are subject to the exclusive jurisdiction of the courts of England and Wales in respect of any proceedings instituted by the Parent, the Debtor or the guarantors of the Existing SSNs and the non-exclusive jurisdiction of the courts of England and Wales in respect of any proceedings instituted by the Existing SSN Trustee or the Existing SSN Holders.

[12]  The New SSNs will be listed on the Official List of the Luxembourg Stock Exchange.  The guarantee and security package of the New SSNs (with the exception of the Parent, which will be wound up as further explained below) will be substantially the same as that of the Existing SSNs, plus guarantees and security issued by Holdco 3, Holdco 2 and Paper Industries Holding S.à r.l. ("Holdco 1," a newly formed Luxembourg company that will be a wholly-owned, direct subsidiary of Holdco 2).  GLAS Trustees Limited is the trustee (the "New SSN Trustee"), and GLAS Trust Corporation Limited is the security trustee (the "New Security Trustee"), with respect to the New SSNs.

portion of: (i) 95% of the New Equity, which will be contractually stapled to the Junior Notes; (ii) €95 million of the Junior Notes and (iii) the New SSNs.  Existing SSN Holders that entered into or acceded to the Lock-up Agreement by November 29, 2019 and are party to the Lock-up Agreement and have not materially breached it as of the Restructuring Effective Date (the "Consenting Noteholders") will receive a consent fee (the "Consent Fee") consisting of their proportionate entitlement to: (i) €5 million of the Junior Notes and (ii) 5% of the New Equity. All Existing SSN Holders were given equal opportunity to become eligible to receive the Consent Fee.  The Consenting Noteholders constitute 94.62% of the Floating Rate SSNs and 90.68% of the Fixed Rate SSNs.  The Consent Fee will be issued to the Consenting Noteholders upon completion of the Group's restructuring.

27.    The Debtor will accede to the RCF as guarantor, as part of the restructuring. Parallel to the Scheme, the RCF will be refinanced in full with: (i) a €55 million revolving credit facility (the "Super Senior RCF") and (ii) a €60 million term loan (the "Super Senior Term Loan" and together with the Super Senior RCF, the "Super Senior Facilities").[13]  The purpose of the Super Senior Facilities is to refinance the RCF and all other existing financal indebtedness of the Group and provide the Group with further liquidity, including to pay the costs and expenses of the restructuring and finance the Group's post-restructuring operations. The Super Senior Facilities will mature two years from the Restructuring Effective Date, subject to a one-year extension at the Restructured Group's election, and will rank senior to the New SSNs.  Torraspapel and its newly formed indirect parent Holdco 1 will be borrowers under the Super Senior Facilities and the Debtor, Holdco 2, Holdco 3 and other members of the Group

---

[13] The Super Senior Facilities will be executed in advance, held in escrow and released on the Restructuring Effective Date.

will be guarantors thereunder.  As part of the restructuring, the Debtor, Sub Lecta, Torraspapel, Condat, Holdco 1, Holdco 2, Holdco 3 and other members of the Restructured Group will grant new security interests to secure their obligations in respect of the New SSNs and the Super Senior Facilities.  In addition, the Super Senior Facilities Lenders and the New SSN Holders will enter into a new intercreditor agreement (the "New Intercreditor"), pursuant to which the Super Senior Facilities are first priority and the New SSNs are second priority.[14]

28.    In addition, the Parent Shareholders that consent to do so will sell their shares in the Parent to a *Stichting* (a Dutch special purpose vehicle) in exchange for €1 or out-of-the-money warrants, at the election of the Parent Shareholders.  Any Parent Shareholders that have not approved the sale and transfer of their shares in Sub Lecta to the *Stichting* will own residual shares in the Parent.  The *Stichting* will wind-up the Parent on a solvent basis. [15]

29.    The Group's restructuring is expected to be completed by the Long-stop Date, subject to any extension in accordance with the terms of the Lock-up Agreement.

## III.    Overview and Key Elements of the Scheme

### A.    The Scheme

30.    Each Existing SSN Holder that acceded to the Lock-up Agreement is required to vote in favor of the Scheme. The Scheme will:

- exchange the Existing SSNS in consideration for:
  - (i)    the New SSNs;

---

[14] The New SSNs rank *pari passu* with the Super Senior Facilities with respect to payment but are subordinated to the Super Senior Facilities with respect to the proceeds of enforcement.

[15] Torraspapel and the other Spanish subsidiaries of the Group that are party to the Group's restructuring also intend to request the *homologación judicial* of the New SSNs, the Super Senior Facilities, the New Intercreditor and certain Spanish law governed security documents, shortly after the Restructuring Effective Date.  The purpose of the *homologación judicial* is to protect these Spanish law security interests and the New SSNs from avoidance or equitable subordination under Spanish law.  In addition, the Group's French subsidiaries, Condat and Torraspapel Malmenayde S.A.S., intend to undergo *conciliation* (a French restructuring proceeding), for tax reasons.

13

      (ii)    €95 million of the Junior Notes; and

      (iii)    95% of the New Equity;

in each case, in proportion to the amount of Existing SSNs held by such Existing SSN Holder;

- provide for:

      (i)    release of all security and guarantees granted in favor of the Existing SSNs; and

      (ii)    payment of the Consent Fee to the Consenting Noteholders; and

- grant authority to the Existing SSN Trustee to execute the documents required to implement the restructuring on behalf of the Scheme Creditors, including, but not limited to:

      (iii)    the New Intercreditor; and

      (iv)    a shareholders agreement in respect of the New Equity.[16]

31.    The Scheme contemplates a single class of Scheme Creditors.  The Scheme also provides for certain releases (the "Releases") to be given by the common depositary of the Existing SSNs, the Existing SSN Trustee and all Scheme Creditors, including a release of any and all claims of the Scheme Creditors against the Debtor, the other members of the Group and each of the following (in each case, in their capacities as such, and collectively, the "Released Parties"):

- the advisors to the Debtor, the Committee, the Existing SSN Trustee, the Existing Security Trustee, the New Security Trustee and the agent under the RCF;
- any current or former director, manager or officer of any member of the Group;
- each member of the Committee and their respective affiliates, related funds, general partners, advisors and managers;
- Lucid Issuer Services Limited (the "Information Agent");
- the Existing SSN Trustee;
- the Existing Security Trustee;
- the New SSN Trustee;
- the New Security Trustee;
- the trustee with respect to the Junior Notes; and

---

[16]  In addition, pursuant to consents obtained under the Scheme, the Parent will sell the shares it holds in Sub Lecta to Holdco 1 (the "Sub Lecta Sale").

14

- any other Scheme Creditor (or its nominee) or such Scheme Creditor's affiliated entities

in connection with the Existing SSN Indentures, the RCF Agreement, the Intercreditor Agreement and the Transaction Security Documents (as defined in the Intercreditor Agreement) (collectively, the "Existing SSN Finance Documents"), the Scheme Creditors' claims against the Debtor in connection with the Existing SSN Finance Documents (except the RCF Agreement) and the negotiation and implementation of the Scheme and the Group's restructuring.  The Scheme Creditors do not, by virtue of the Releases, waive their rights or remedies under the Scheme or the documents that implement the Group's restructuring, and do not waive their claims arising out of fraud or willful misconduct by any Released Party.

32.    Implementation of the Scheme is a critical step in the consummation of the Group's restructuring.[17]  I believe that if the Scheme and the restructuring are not implemented, the Debtor, the Parent and the guarantors of the Existing SSNs are likely to enter into insolvency proceedings in which the Existing SSNs are highly unlikely to be repaid in full.  This would diminish Scheme Creditors' recoveries and jeopardize the Group's ability to operate its business.

33.    The Scheme proposes a timeline to complete the Group's restructuring by February 3, 2020 (ahead of the Long-stop Date).  The Group believes that this timeline is feasible given that the Group has been in discussions with the Scheme Creditors and other key stakeholders for approximately six months.  Given the Group's high profile in Europe, its restructuring efforts have been widely reported.  The Group believes that it is critical for the Group to implement its restructuring as soon as possible to maintain the confidence of its

---

[17]  Satisfaction or waiver of all of the conditions precedent to issuance of the New SSNs and the Junior Notes is one of the conditions to the occurrence of the Restructuring Effective Date.

15

suppliers and customers. Further delay could result in loss of market confidence, which may seriously impact the viability of the Group's business and the success of its overall restructuring.

### B.    Practice Statement Letter and the Scheme Meeting

34.    In order to implement the Scheme, on December 5, 2019, the Information Agent sent the practice statement letter and the applicable term sheets, steps plan and other documents relating to the Scheme (together, the "PSL") to the Scheme Creditors through document management clearing systems maintained by Clearstream Banking S.A. and Euroclear Bank S.A./N.V. (the "Clearing Systems"). The PSL informed Scheme Creditors of the substance of the Scheme and invited any Scheme Creditors to identify themselves for the purposes of the Scheme Meeting. On December 11, 2019, the Information Agent notified the Scheme Creditors of the date and location of the Convening Hearing regarding the Scheme through the website maintained by the Information Agent in respect of the Scheme (the "Scheme Website") and via the Clearing Systems. The Information Agent published the Scheme and related documents on the Scheme Website on December 19, 2019 and notified the Scheme Creditors via the Clearing Systems, and the known Scheme Creditors via email, that these documents were available there. On the same date, the Information Agent also posted the notice of the Scheme Meeting on the Luxembourg Stock Exchange.

35.    As stated above, on December 19, 2019, the High Court held the Convening Hearing and entered the Convening Order authorizing the Debtor to convene the Scheme Meeting.

36.    The Scheme Meeting will take place on January 23, 2020. Following the Scheme Meeting and upon receiving the necessary votes in favor of the Scheme, the High Court will

conduct a hearing to consider sanctioning (*i.e.* approval) of the Scheme on or around January 28, 2020 (the order sanctioning the Scheme, the "Sanction Order").

### C.    My Appointment as Foreign Representative of the Debtor

37.    On December 3, 2019, by written resolution, the board of directors of the Debtor authorized me to act on behalf of the Debtor as the Debtor's Foreign Representative in its Chapter 15 Case.

38.    On December 19, 2019, the High Court authorized me to act as the Foreign Representative of the Debtor in respect of the Scheme in any case under chapter 15 of the Bankruptcy Code to obtain recognition of the Scheme as a "foreign main proceeding."

## IV.    Need for Chapter 15 Relief

39.    The English Proceeding and the Scheme comport with English law and, I am advised by U.S. counsel, satisfy the requirements for recognition and enforcement under chapter 15 of the Bankruptcy Code. Recognition of the English Proceeding, enforcement of the Scheme and the Sanction Order within the territorial jurisdiction of the United States and approval of the Injunction will be critical components to implement the Scheme without disruption or the threat of adverse actions by dissenting creditors against the Debtor or its assets in the United States. Without assistance from this Court, the Scheme could be fundamentally undermined to the detriment of all parties in interest. I believe that the interests of all Scheme Creditors are aligned with the Debtor in obtaining recognition of the English Proceeding, enforcement of the Scheme within the territorial jurisdiction of the United States and approval of the Injunction to ensure that the Scheme is implemented successfully.

40.    I have also requested that the Court cause the Proposed Order to become effective immediately upon entry, notwithstanding the 14-day stay of effectiveness of that order. I

believe that it is critical for the Group to implement its restructuring as soon as possible to maintain confidence with its suppliers and customers. Waiver of the 14-day stay of effectiveness period is appropriate in these circumstances to allow the Debtor to proceed immediately with the implementation of the Scheme in accordance with the timetable set forth in the Scheme.

**V.     Conclusion**

41.     For the reasons stated herein and in the Petition, I respectfully request that the Petition for recognition of the English Proceeding as a foreign main proceeding and for related relief be granted in its entirety, together with such other and further relief as this Court deems just and proper.

[*Signature Page Follows*]

I declare under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  December 19, 2019

*/s/ Andrea Minguzzi*
Andrea Minguzzi
Director
Group Executive Chairman